COMMERCIAL FISHERIES ENTRY
COMMISSION, State of
Alaska, Appellant,

v.

John E. APOKEDAK, Appellee.

No. 4464.

Supreme Court of Alaska.

Feb. 5, 1980.

1256

Jonathan K. Tillinghast, Asst. Atty. Gen. and Avrum M. Gross, Atty. Gen., Juneau, for appellant.

James G. Robinson, David B. Snyder, and Joel Bolger, Alaska Legal Services Corp., Dillingham, for appellee.

J. P. Tangen and Pamela L. Finley, Robertson, Monagle, Eastaugh & Bradley, Juneau, for Eugene Anderson, et al., as amici curiae in support of appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER and BURKE, JJ., and DIMOND, Senior Justice.

## OPINION

BOOCHEVER, Justice.

In 1973, the Alaska legislature passed an act authorizing a commission to regulate entry into the commercial fisheries for all fishery resources in the state (hereinafter Limited Entry Act).[1] The Act specified that after January 1, 1974, "no person may operate gear in the commercial taking of fishery resources without a valid entry permit or a valid interim-use permit issued by the commission."[2] Only persons who had harvested fishery resources commercially while participating in the fisheries as holders of gear licenses are eligible to apply for entry permits.[3]

Apokedak was a commercial fisherman who had never owned a gear license. He appealed to the superior court a decision of the Commercial Fisheries Entry Commission (hereinafter Commission) denying him a permit, contending that: (1) the refusal to accept his application was in violation of the mandate of *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976); (2) he was in fact a gear license holder within the meaning of AS 16.43.260 by virtue of his joint venture or partnership with a gear license holder, George Wilson, in 1970 and 1971; (3) the gear license requirement is unconstitutional as a violation of the equal protection clauses of the United States and Alaska Constitutions; and (4) the Commission's regulation requiring a gear license for income dependence points is invalid.[4]

Based upon its interpretation of *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), the superior court held that AS 16.43.260(a) violated the equal protection clause of the state and federal constitutions insofar as it required an applicant for an entry permit to show that he had previously held a gear license. The superior court remanded Apokedak's application to the Commission for reconsideration.

■ The Commission appealed the superior court's decision to this court.[5] The Commission argues on appeal that:

(1) Apokedak's appeal to the superior court was untimely filed under Appellate Rule 45 and, therefore, should have been dismissed.

(2) *Isakson v. Rickey* did not in fact invalidate the gear license requirement contained in AS 16.43.260(a).

(3) The gear license requirement contained in AS 16.43.260(a) does not violate the equal protection clause of the state or federal constitutions.

(4) The Commission's regulations, which limit the award of certain "hardship" points only to gear license holders, do not exceed the statutory delegation of authority to the

---

1. Ch. 79, § 1, SLA 1973, codified as Title 16, Chapter 43, of the Alaska Statutes.

2. AS 16.43.140.

3. AS 16.43.260, as amended by ch. 126, § 3, SLA 1974.

4. It is disputed whether this last point was raised before the superior court.

5. This case was accepted as an appeal prior to our decision in *City and Borough of Juneau v. Thibodeau*, 595 P.2d 626 (Alaska 1979), which held that a superior court order issued in the court's appellate capacity which remands for further proceedings is not a final judgment. 595 P.2d at 629. Since the matter was remanded to the Commission for reconsideration, we shall treat the appeal as a petition for review.

Commission and do not deprive Apokedak of equal protection of the laws.

■ We hold that the superior court did not abuse its discretion in waiving the rules and accepting Apokedak's untimely appeal in view of the peculiar circumstances of this case;[6] that *Isakson* did not invalidate the gear license requirement of AS 16.43.260(a); and that the gear license requirement does not violate the equal protection clauses. We do not pass on the validity of the Commission's regulations and the question of whether Apokedak was in fact a gear license holder.

## I. HISTORICAL OVERVIEW

Before embarking on an equal protection analysis, it is necessary to examine prior decisions concerning Alaskan efforts to limit entry into the fisheries. In 1961, an act was passed authorizing the Board of Fish and Game to determine an "optimum" run for the various salmon fishing areas in the state. When the yearly run was substantially less than the optimum, so that Alaska residents licensed to fish in that area could not catch sufficient fish to sustain them for the year, the act authorized the Board to promulgate regulations temporarily closing the area to nonresident fishermen.[7] In an action brought by nonresident fishermen, the law was declared to be invalid by a three-judge federal court as violative of the United States Constitution's privileges and immunities, and commerce clauses, as well as the Alaska Constitution's equal protection and due process clauses.[8]

■ The next legislative enactment did not differentiate as to nonresidents in the manner of the 1961 law. Chapter 186, SLA 1968 limited issuance of salmon net gear licenses to persons previously holding a salmon gear license for the specific salmon registration area, or holding a commercial fishing license for three years, who, while so licensed, actively engaged in commercial fishing in that area. In *Bozanich v. Reetz*, 297 F.Supp. 300 (1969), *rev'd*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), the law was held to be invalid by a three-judge federal court. With reference to equal protection, the court stated:

> Although a state may enact fishing regulations in the legitimate interests of con-

---

**6.** Apokedak's application was initially denied on July 9, 1975, for the reason that he had not held a gear license between the dates of January 1, 1960 and January 1, 1973. He was notified that he could request a hearing by August 23, 1975. Apokedak did not request a hearing, but on May 14, 1976, wrote to the Commission seeking an interim permit for the 1976 season. He was advised that only those involved in hearings on their original applications could receive interim-use permits. On June 24, 1977, the Alaska Legal Services Corporation, representing Apokedak, asked the Commission for a "determination" with respect to Apokedak's application. On July 20, 1977, the Commission informed Apokedak that it was "sustaining" the July 9, 1975, determination, because the time period for requesting an administrative hearing had expired on August 23, 1975. Specifically, the Commission's letter stated:

> On June 24, 1977, your attorney, Toby Thaler, requested an administrative hearing to contest the July 9, 1975, notice of determination in which you were found ineligible to apply for an entry permit. The period for requesting an administrative hearing expired August 23, 1975, and there are no statements in your file which excuse the failure to request a hearing in a timely fashion. Conse-

quently, I am sustaining the July 9, 1975, determination.

The Commission's letter closed with the following paragraph:

> For purposes of exhaustion of administrative remedies, this letter is the final action on your application. Under the Court Rules of Alaska, Appellate Rule 45 (enclosed), you have 30 days from the date on this letter to appeal your denial to a superior court in this State.

On August 15, 1977, Apokedak appealed the Commission's July 20, 1977, decision to the superior court. Since Apokedak did not timely request an administrative hearing, he was required under Appellate Rule 45 to appeal the July 9, 1975, determination within thirty days, which he failed to do. The superior court relaxed the rules to accept the late appeal. Since other cases are pending involving essentially the same issues and in view of the importance of those issues and the fact that the case has been extensively briefed and argued, we have decided to treat the appeal on its merits.

**7.** Ch. 62, SLA 1961.

**8.** *Brown v. Anderson*, 202 F.Supp. 96, 103 (D.C. 1962).

servation and safety, it may not, to achieve those ends, employ arbitrary and irrational means which create or protect local, monopolistic interests. Under the scheme, entry into the salmon fishing industry is controlled not by the state, but by local fishermen in each area who are eligible for gear licenses and can choose among the commercial fishermen, if any, that they might wish to hire. The power to permit competition cannot be vested in *private* interests whose own benefit would ordinarily not be served by assisting potential competitors to qualify.

We are convinced that the Alaska scheme cannot meet the equal protection requirements set forth in *Morey v. Doud*, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485, wherein the Supreme Court struck down another invidious classification in legislation concerning economic regulation.[9]

Reetz appealed to the United States Supreme Court which held that the trial court should have abstained from deciding the federal questions until Alaska courts could decide whether the act violated article VIII, section 15, of the Alaska Constitution.[10] That section prohibits creation of an exclusive right or special privilege of fishery. The case was next heard by the Alaska Superior Court which held, *inter alia*, that the act violated the prohibition against creation of an exclusive right or special privilege of fishery.[11]

Shortly thereafter, in 1972, Alaska's Constitution was amended by adding to article VIII, section 15, the following:

> This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.

In 1973, the Limited Entry Act was passed. Its stated purpose is set forth in AS 16.43.010 as follows:

> *Purpose and findings of fact.* (a) It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination.
>
> (b) The legislature finds that commercial fishing for fishery resources has reached levels of participation, on both a statewide and an area basis, that have impaired or threaten to impair the economic welfare of the fisheries of the state, the overall efficiency of the harvest, and the sustained yield management of the fishery resource.

In *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), the 1973 Act was challenged on equal protection grounds. In *Isakson*, a group of fishermen challenged the Limited Entry Act,[12] focusing on AS 16.43.260(a), which

9. *Bozanich*, 297 F.Supp. at 305 (footnote omitted) (emphasis in original).

10. *Reetz v. Bozanich*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970).

11. *Bozanich v. Norenberg*, Civil No. 70–389 (Alaska Super.Ct., 1st Judicial Dist., March 8, 1971), an unreported decision of which we take judicial notice. Alaska Rule of Evidence 202.

12. A brief review of the legislative history of the Limited Entry Act is helpful in understanding *Isakson*. As submitted by the governor and introduced into the legislature in January, 1973, the bill contained no cut-off date or gear license requirement. S.B. 39, 8th Leg., 1st Sess. (Jan. 11, 1973); H.B. 126, 8th Leg., 1st Sess. (Jan. 24, 1973). The first committee redrafts of the bill were offered on March 5, 1973,

by the House Resources Committee, and on March 7, 1973, by the House Judiciary Committee. Both these redrafts contained a requirement that only gear license holders who actually participated in the fisheries would be eligible to apply for entry permits. C.S.H.B. 126, 8th Leg., 1st Sess. § 16.43.210(a) (March 5, 1973) (House Resources Committee); C.S.H.B. 126, 8th Leg., 1st Sess. § 16.43.210(a) (March 7, 1973) (House Judiciary Committee). The drafts also contained a separate provision that applicants would be ranked according to their qualifications "as of January 1, 1973." In both the Resources and Judiciary Committee substitutes referred to, this provision appears as § 16.43.210(d). The Judiciary Committee substitute passed the House on March 23 (*see* 1973 House Journal 823) and was sent to the Senate. On March 30, the Senate Resources Committee

provided, prior to its amendment: [13]

> The commission shall accept applications for entry permits only from applicants who have harvested fishery resources commercially while participating in the fishery as holders of gear licenses . . before January 1, 1973.[14]

In the nineteen salmon fisheries which first came under the Limited Entry Program,[15] applications for entry permits were not accepted until December, 1974.[16] Thus, nearly two years elapsed between the time of the gear license cut-off date of January 1, 1973, and the time entry permits began to be issued. As noted in *Isakson,* persons who had sold their vessels and gear and had abandoned fishing were entitled to receive entry permits, but some of those people who were actively fishing in the seasons just prior to the time entry permits were issued could not even apply. *Id.* at 365. The plaintiffs in *Isakson* were salmon fishermen who became gear license holders after January 1, 1973, in those fisheries which were designated for limited entry in 1974. We stated:

> offered its substitute for the House Bill (*see* 1973 Senate Journal 692). New language allowed only those who had fished with gear licenses prior to January 1, 1973, to apply. S.C.S. C.S.H.B. 126, 8th Leg., 1st Sess. § 16.43.-260(a) (March 30, 1973). Thus, the final version of the bill contained two cut-off dates, one relating to determination of qualifications, and one relating to eligibility to apply.

13. In 1974, AS 16.43.260(a) was amended to read:

> The commission shall accept applications for entry permits only from applicants who have harvested fishery resources commercially while participating in the fishery as holders of gear licenses . . . before the qualification date established in (d) or (e) of this section.

*See* ch. 126, § 3, SLA 1974. This is the current version of the statute. Subsections (d) and (e) provide as follows:

> (d) Except as provided· in (e) of this section, an applicant shall be assigned to a priority classification based solely upon his qualifications as of January 1, 1973.
>
> (e) When the commission establishes the maximum number of entry permits for a particular fishery under § 240 of this chapter after January 1, 1975, an applicant shall be assigned to a priority classification based

The plaintiffs below appeal the trial court's decision, *contending that the date utilized in AS 16.43.260(a)* violates the equal protection clause of the Fourteenth Amendment to the United States Constitution . . . .

550 P.2d at 361 (emphasis added).[17] The plaintiffs in *Isakson* specifically challenged the cut-off date for applying, not the requirement that applicants be holders of gear licenses. They *were* holders of gear licenses. Their interest was in having the cut-off date declared invalid so that they might qualify for the pool of "gear licensees" who would then be considered for entry permits on the basis of hardship criteria.

The precise issue was framed in the following terms:

> [T]he question presented is *whether the circumstance of holding a gear license before January 1, 1973,* bears a fair and substantial relation to the purpose sought to be advanced by AS 16.43.260(a), when examining intensively the means used and the reasons advanced therefor.

solely upon his qualifications as of January 1 of the year during which the commission establishes the maximum number of entry permits for the fishery for which application is made.

In *Isakson,* the court noted this amendment to the Limited ·Entry Act. 550 P.2d at 361 n.5. The reference to the amended version causes amici to conclude that the court invalidated the gear license requirement itself, because the cut-off date was eliminated by the amendment. We do not reach such an inference from that historical footnote.

14. *See* ch. 79, § 1, SLA 1973.

15. These nineteen "designated" fisheries are enumerated in 20 AAC 05.300–.310(a).

16. 20 AAC 05.510(a).

17. The court summed up the argument advanced by·the plaintiffs in the trial court in this way:

> . The plaintiffs argued . . . *that the cut-off date of January 1, 1973,* which prevented them from submitting an application for a free commercial fishing entry permit, denied them equal protection of the laws.
>
> 550 P.2d at 361 (emphasis added).

*Id.* at 363 (emphasis added). We found that one of the primary purposes of the Act is to avoid unjust discrimination by ranking applicants for the limited number of permits "according to the degree of hardship which they would suffer by exclusion from the fishery." Noting that the provision inserting the cut-off date was added after the provision requiring an applicant to be a gear license holder, we explored the reasons for the insertion of the cut-off date, not for the gear license requirement. Since the Act already provided for a determination of "hardship" as of January 1, 1973,[18] we held that the cut-off date was unnecessary to frustrate the rush to secure gear licenses which occurred in 1973. *Id.* at 364. The holding of *Isakson* is that the 1973 cut-off date is violative of equal protection because it does not bear a fair and substantial relation to the purpose of the legislation, *i. e.*, to segregate hardship and non-hardship cases. *Id.* at 365. Subsequent to the decision in *Isakson*, the Limited Entry Commission accepted applications from those who had fished with gear licenses during the 1973 and 1974 seasons.[19] Their qualifications were determined as of January 1, 1973, as that date was unaffected by the *Isakson* decision.

Admittedly, there is some broad language in the opinion, particularly in addressing Justice Connor's dissent, which could be construed as indicating an intent to invalidate the gear license requirement in its entirety. We regard such statements as dictum and to the extent that they may be construed differently from the views set forth in this opinion they are superceded.[20]

*Isakson* did not invalidate AS 16.43.-260(a)'s gear license requirement. Consequently, we must now determine whether the gear license requirement violates the equal protection clause of either the state or federal constitution.

## II. EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION

Since Alaska has adopted a different standard for review of legislation for some equal protection purposes,[21] it will be necessary to determine separately whether the gear license requirement violates the federal constitution.

■ The fourteenth amendment provides in part that no state may "deny to any person within its jurisdiction the equal protection of the laws." The United States Supreme Court has applied dual standards to equal protection challenges. The state must prove a "compelling state interest" to justify classifications based on race,[22] national origin[23] or alienage,[24] and such classifications are subjected to strict scrutiny. A similar standard is applied when fundamental rights are at stake.[25]

18. *See* AS 16.43.260(d), set forth in note 13 *supra.*

19. 20 AAC 05.510(f).

20. We can well understand the trial court's reliance on the language used in this portion of the opinion.

21. *State v. Erickson*, 574 P.2d 1, 11–12 (Alaska 1978); *Isakson v. Rickey*, 550 P.2d 359, 361–63 (Alaska 1976); *State v. Wylie*, 516 P.2d 142, 145 n.4 (Alaska 1973).

22. *Hunter v. Erickson*, 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616, 622–23 (1969); *Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010, 1016–17 (1967).

23. *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

24. *See In re Griffiths*, 413 U.S. 717, 721, 93 S.Ct. 2851, 2854, 37 L.Ed.2d 910, 915 (1973), invalidating state prohibition against resident alien's admission to practice law; *Graham v. Richardson*, 403 U.S. 365, 375, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534, 543 (1971), denial of welfare benefits to aliens; *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), refusal to grant commercial fishing licenses to aliens.

25. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (right of privacy); *Zablocki v. Redhail*, 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618, 628 (1978) (right to marry); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 667, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169, 172 (1966) (right to vote); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1965) (right to pro-

In cases not involving suspect classes or fundamental rights, the United States Supreme Court has generally applied the less restrictive rational basis test.[26] Apokedak does not suggest that the Limited Entry Act involves a suspect classification, and the availability of employment opportunity has not been considered a fundamental right so as to require application of the compelling state interest test.[27] The applicable test, therefore, is "whether the classification is reasonable, possesses some rational connection to the measure's legitimate purpose and treats all within the class alike."[28] Under this test, legislation is presumed to be reasonable,[29] and any reasonably conceivable facts justifying the classification will be accepted.[30]

Historically, economic regulation usually has been challenged under the due process clause rather than on equal protection grounds. During the past century there has been a wide variation in the latitude accorded to legislative determinations regarding regulation of such activities. As one commentator has stated:

> The due process clause of the fourteenth amendment has experienced a history of chameleon-like construction by the United States Supreme Court. Like its fifth amendment companion, due proc-

ess of law originally served simply as a *procedural* check on governmental encroachment upon individual rights. Near the end of the nineteenth century the notion that due process imposed *substantive* limitations on state and federal legislation found favor with a majority of the Supreme Court. The concept of "liberty" was extended to include "the right to live and work where [one] willed" and "to earn his livelihood by any lawful calling." Legislation regulating economic activities was struck down as "meddlesome interferences with the rights of the individual" in violation of due process. Only economic activities deemed "affected with a public interest," constituted proper subjects of governmental control. The determination as to what activities fell under the label shifted from a legislative to a judicial function.[31]

But:

> [T]he day is gone when the Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.[32]

There no longer can be any question that when economic legislation is chal-

create); *see generally* T. Jackson, *The Constitutionality of a Program Restricting the Number of Commercial Fishermen in the Coastal Waters of the United States*, 34 La.L.Rev. 801, 811 (1973) (hereinafter referred to as Jackson).

**26.** In some areas, the Court has applied a "middle-level" scrutiny. *See Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976).

**27.** *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 755–756, 1 L.Ed.2d 796 (1957); *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 487–89, 75 S.Ct. 461, 464–465, 99 L.Ed. 563, 571–73 (1955).

**28.** Jackson *supra* note 25 at 811. *See McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393, 398 (1961); *State v. Wylie*, 516 P.2d 142, 143, 145 (Alaska 1973).

**29.** *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739, 745 (1969); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

**30.** *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393, 398 (1961).

**31.** *See* Jackson, *supra* note 25 at 806–07 (footnotes omitted) (emphasis in original).

**32.** *Id.* at 808 (footnote omitted), *quoting Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563, 572 (1955). Similarly, the day is gone when the Court uses the equal protection clause to strike down economic regulations. Now the Court "consistently defers to legislative determinations as to the desirability of particular statutory discriminations." *Friedman v. Rogers*, 440 U.S. 1, 17, 99 S.Ct. 887, 898, 59 L.Ed.2d 100, 114 (1979), *quoting New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511, 516–17 (1976). *See, e. g., McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

lenged, the court will defer to the judgment of the legislature concerning the desirability of particular statutory classifications.[33]

We now apply these considerations to the Limited Entry Act. Under the federal rational basis standard, we must decide whether the classification of prior gear licensees as the class eligible to apply for entry permits is reasonable—that is, whether the license requirement possesses some rational connection to the measure's purpose. The overall economic and conservation goals of the Act are met by limiting the number of permits. The associated goal of preventing unjust discrimination in the allocation of the limited number of permits involves a legislative determination as to the relative hardship that will be imposed on different classes of applicants.[34]

■ To obtain an entry permit, one had to have previously harvested fishery resources commercially as a gear licensee. AS 16.43.260. To be a gear licensee, one personally had to own or lease fishing gear and operate or assist in the operation of the fishing gear. AS 16.05.540. Thus, a person applying for an entry permit was required to have both previously owned or leased fishing gear and possessed a gear license. Since such persons would have had a unique status in the fishing industry, they alone, if prohibited from applying for a limited entry permit, would be deprived of that status which they had previously enjoyed, namely, that of a licensed gear operator. It is also

reasonably conceivable that they generally would have the greater financial investment in the industry as owners or lessors of vessels and gear. Therefore, the gear license requirement is rationally related to the goal of preventing unjust discrimination in the allocation of entry permits. Considering those factors and the presumption of reasonableness, we conclude that under the federal constitution the classification does not violate the equal protection clause.

*New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), removes any doubt. In *Dukes,* a New Orleans ordinance prohibited vendors from selling foodstuffs from push carts in the French Quarter, but exempted from the prohibition vendors who had continuously operated businesses within the same locality for eight years before the effective date of the amendment. There were only two operators who qualified for the exemption. In upholding the classification,[35] the Court set forth the standard to be utilized in determining whether an economic measure violates the federal equal protection requirement as follows:

When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage,

---

**33.** *See, e. g., Friedman v. Rogers,* 440 U.S. 1, 16–18, 99 S.Ct. 887, 897–899, 59 L.Ed.2d 100, 114–15 (1979); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511, 516–17 (1976); *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359–60, 93 S.Ct. 1001, 1003–1004, 35 L.Ed.2d 351, 354–55 (1973); *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Kotch v. Bd. of River Port Pilot Comm'rs,* 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947).

**34.** *See Isakson v. Rickey,* 550 P.2d 359, 363 (Alaska 1976).

**35.** We note that in the *Bozanich* case, discussed at pages 1258–1259 *supra,* the three-judge federal court based its decision that the earlier limited entry act violated equal protection in part on a feature not present in the

current act—that entry into the salmon fishery was controlled not by the state but by the eligible gear licensees who could choose the commercial fishermen required to fish for three years so as to be eligible for a gear license. More significant, however, was the reliance on *Morey v. Doud,* 354 U.S. 457, 469, 77 S.Ct. 1344, 1352, 1 L.Ed.2d 1485, 1493 (1957). In *Morey,* the court held violative of equal protection an Illinois act which required firms selling money orders in the state to secure a license, but which exempted the American Express Company from the licensing requirement. *Dukes* expressly overruled *Morey* because "the decision so far departs from proper equal protection analysis in cases of exclusively economic regulation." 427 U.S. at 306, 96 S.Ct. at 2518, 49 L.Ed.2d at 518–19.

our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step, in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.[36]

We hold that the gear license requirement for limited entry permit applicants does not violate the equal protection clause of the fourteenth amendment of the United States Constitution.[37]

## III. EQUAL PROTECTION UNDER THE ALASKA CONSTITUTION

Article I, section 1, of the Alaska Constitution provides, in part, "that all persons are equal and entitled to equal rights." In *State v. Erickson*, 574 P.2d 1 (Alaska 1978),

we set forth a comprehensive approach to equal protection challenges under our state constitution.

Initially, we must look to the purpose of the statute, viewing the legislation as a whole, and the circumstances surrounding it. It must be determined that this purpose is legitimate, that it falls within the police power of the state. Examining the means used to accomplish the legislative objectives and the reasons advanced therefore, the court must then determine whether the means chosen substantially further the goals of the enactment. Finally, the state interest in the chosen means must be balanced against the nature of the constitutional right involved.

*Id.* at 12 (footnotes omitted).

We apply a single test which is nevertheless flexible and dependent upon the importance of the rights involved. Based on the nature of the right, a greater or lesser burden is placed on the state to show that the classification has a fair and substantial relation to a legitimate governmental objective.[38] We shall now apply the *Erickson* test to the gear license requirement.

Seldom, if ever, will a statutory scheme, especially one as complicated as the Limited Entry Act, have a single monolithic purpose. The legislature usually acts with a variety of purposes in mind and each of these purposes deserves judicial recognition.[39]

---

**36.** 427 U.S. at 303, 96 S.Ct. at 2516, 49 L.Ed.2d at 516–17 (citations omitted).

**37.** *State ex rel. Bacich v. Huse*, 187 Wash. 75, 59 P.2d 1101 (1936), invalidating a Washington limited entry law, does not support a contrary result because it is distinguishable. The issue presented in *Bacich* was similar to the issue presented in *Isakson*. The question presented was "whether there is any reasonable basis for distinction between persons who held licenses in [1932 or 1933] and persons who did not." *Id.*, 59 P.2d at 1104. These two years did not include the year the limited entry act was passed. Thus, persons who held licenses in 1934 and before 1932 were excluded. The court held that the act was arbitrary because it awarded licenses to those who may have happened to have a license in 1932 or 1933, yet

excluded those who had a license in 1934 or prior to 1932. Thus, it found that possession of a license in 1932 or 1933 did not further the purpose of protecting those whose sole livelihood was gill netting. The *Bacich* court did not find that the requirement that an applicant previously possess a license was arbitrary or unreasonable. In any event, *Bacich* was decided before *Dukes* and, thus, its precedential value under the federal constitution is questionable.

**38.** *State v. Erickson*, 574 P.2d at 11–12.

**39.** This is not to say that the judiciary is required to hypothesize or invent purposes, something *Isakson's* intensified scrutiny test specifically rejects. Close examination of the statutory scheme will usually yield several concrete legislative purposes having a substantial

From the legislature's statement of purpose in AS 16.43.010,[40] we discern the following broad purposes: 1) enhancing the economic benefit to fishermen since too many involved in the industry prevented those relying on fishing for a livelihood from securing adequate remuneration; 2) conserving the fishery; and 3) avoiding unjust discrimination in the allocation of a limited number of entry permits. Admittedly, another purpose behind the license requirement was 4) administrative convenience.[41]

 Undoubtedly, the conservation and economic purposes of the Act are legitimate because they are within the police power of the state.[42] These purposes were fulfilled by limiting the number of entry permits. AS 16.43.240(a).[43] This is accomplished initially by reference to the number

of units of gear fished in the specified area in designated prior years, a means independent of the requirement that applicants be prior gear licensees. Consequently, we cannot agree with the Commission that requiring applicants to be prior licensees furthers the purpose of conserving the fishery. The conservation of the fishery was accomplished without any help from AS 16.43.-260(a)'s requirement that applicants be prior gear licensees.

Having established a method of limiting the maximum number of permits to be issued, the legislature had to specify a means of allocating those permits. This could have been accomplished by any number of methods, including a lottery or auction.[44] The purposes of promoting administrative convenience and avoiding unjust discrimina-

---

basis in reality, even if these purposes are not specifically identified in a statutory purpose clause.

**40.** AS 16.43.010 is quoted in full at page 8 *supra.*

**41.** The Commission contends that the purposes of the Act include: 1) a freeze of the number of gear licenses to conserve the fishery; 2) making permits available to other than initial holders, by allowing the sale of permits; and 3) reducing the maximum number of permits by the buy-back provisions of the Act. Purposes 2 and 3 are not relevant to the gear license requirement; therefore, their legitimacy will not be discussed.

**42.** The legislature's announced purpose closely parallels the constitutional provision granting to the state the power to limit entry into the fisheries. Article VIII, section 15, of the Alaska Constitution provides:

*No Exclusive Right of Fishery.* No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.

Thus, the legislature acted within its power when it sought to conserve the fisheries through limitation on entry designed to protect those most economically dependent on the fisheries.

**43.** AS 16.43.240(a) provides:

Except as provided in section 270(a) of this chapter, the maximum number of entry permits for a distressed fishery designated under § 230 of this chapter shall be the highest number of units of gear fished in that fishery during any one of the four years immediately preceding January 1, 1973.

**44.** The following methods of achieving limited entry have been suggested in a study entitled "Legal Aspects of Limited Entry for Commercial Marine Fisheries," by H. Gary Knight and James P. Lambert (October 15, 1975):

(a) Use of landing laws to place physical and economic restraints on long distance fishermen or on fishermen transferring fishery products out of the state of catch.

(b) Unlimited availability of licenses or permits, but increase of fees to the point where an appropriate reduction in the amount of effort is achieved because some fishermen are unable to afford the higher fee.

(c) Limited availability of licenses or permits, with allocation of access rights to fishermen on some basis other than escalation of permit cost.

(d) Establishment of individual fishermen quotas, in which the total of quotas allocated would equal the desired allowable catch or annual yield.

(e) Buy back of fishing equipment from fishermen at prices sufficiently attractive to result in a reduction of effort; capital for such a program could be derived from general funds (a public subsidy) or through a tax on the normal license fees (internal industry support).

tion in the allocation of permits are related to this problem.

■ The gear license requirement relieves the Commission of the burden of processing and ranking all persons choosing to apply. Although the purpose of promoting administrative convenience is legitimate, it cannot outweigh the important right to engage in economic endeavor,[45] which in some cases may involve the right to employment in the industry.[46]

■ The other purpose in limiting the eligible pool of applicants to gear license holders is to prevent unjust discrimination by allocating permits according to the degree of hardship which a person would suffer by exclusion from the fishery.[47] The purpose of preventing unjust discrimination in the awarding of entry permits is undoubtedly legitimate. *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976). Thus, the crucial issue is whether the circumstance of holding a gear license bears a fair and substantial relationship to that purpose sought to be advanced by AS 16.43.260(a), avoiding unjust discrimination in the awarding of entry permits.

A consideration in determining unjust discrimination is the loss to be suffered by exclusion from the fishery. In that regard, it is only the former gear license holders who would lose a privilege which they had previously enjoyed—that of operating or assisting in the operation of fishing gear as a gear license holder. Nongear licensees who fished as commercial fishermen are still entitled to participate in the same capacity as before the enactment. They are free to seek employment in the fishery, and there is no restriction on their securing commercial fishing licenses.[48] They are deprived of some opportunities of changing their status in the fishing industry which were previously available, although they may secure an entry permit by transfer, purchase or inheritance. But the deprivation of the opportunity to change status is quite different from the loss of a status previously acquired.

An analogy suggested at oral argument seems apt. Assuming that legislation could validly be enacted limiting the number of licenses to practice law and a determination had to be made of those to be entitled to apply for the licenses, based on hardship, one solution would be to limit applicants to those who had licenses in the past. Parale-

45. While administrative convenience is a legitimate purpose, it will usually not outweigh the nature and the importance of the right which it impinges on. *See Isakson v. Rickey*, 550 P.2d at 365.

46. There is no restriction on applying for a commercial fishing license, but a fisherman, to engage in his employment, must secure a position with a gear licensee.

47. The legislature specified in AS 16.43.250(a):
*Standards for initial issue of entry permits.* (a) Following the establishment of the maximum number of units of gear for a particular fishery under § 240 of this chapter, the commission shall adopt regulations establishing qualifications for ranking applicants for entry permits according to the degree of hardship which they would suffer by exclusion from the fishery. The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the following hardship standards:
(1) degree of economic dependence upon the fishery, including but not limited to percentage of income derived from the fishery, reliance on alternative occupations, availabil-

ity of alternative occupations, investment in vessels and gear;
(2) extent of past participation in the fishery, including but not limited to the number of years participation in the fishery, and the consistency of participation during each year.

48. AS 16.05.480 provides:
*Commercial fishing license.* (a) A person engaged in commercial fishing shall obtain a commercial fishing license. The fee for the license is $10 for residents, and $30 for nonresidents. Except for those which are also entry or interim-use permits, all commercial fishing licenses are nontransferable. The commercial fishing license shall be retained in the possession of the licensee, readily accessible for inspection at all times. No more than one fee may be charged annually against a person. For the purposes of this section, "commercial fishing license" includes entry permits and interim-use permits issued under chapter 43 of this title and crewmember fishing licenses.
(b) A person applying for a resident commercial license under this section shall provide the proof of his residence which the department requires by regulation.

gals and others who would like to seek entry into the profession might be barred from initial eligibility and thus from advancement to a different status from that previously enjoyed. Nevertheless, it could be concluded that the deprivation of the right to a license previously utilized poses a distinct hardship of a different and usually more substantial nature from that encountered by those not previously licensed. The means used to limit the number of licensees would bear a substantial relationship to the purpose of selection according to hardship caused by inability to secure a license.

In fact, what has been done by the Limited Entry Act is but a modification of granting "grandfather rights," by which those who were previously engaged in a particu-

lar activity are authorized to continue in the enterprise, although the entry of others is restricted. Acts conferring "grandfather rights" have generally withstood equal protection challenges.[49]

▇▇▇▇ Admittedly, in the analogy referred to above, as well as in the fishing industry, individual cases will arise in which those barred may be able to show extreme hardship.[50] The legislature in its wisdom could conceivably have better provided for such instances. But equal protection, even under Alaska's stricter standard, does not demand perfection in classification. If it did, there would be few laws establishing classifications that would sustain an equal protection challenge.[51]

---

**49.** *See generally City of New Orleans v. Dukes*, 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976); *United States v. Maryland Savings Share Ins. Corp.*, 400 U.S. 4, 6, 91 S.Ct. 16, 17, 27 L.Ed.2d 4, 7 (1970); *Lynden Transport, Inc. v. State*, 532 P.2d 700 (Alaska 1975); *State v. Durham*, 6 Storey 170, 191 A.2d 646, 651 (Del.Super.1963); *Commonwealth Air Transport v. Stuart*, 303 Ky. 69, 196 S.W.2d 866, 869 (Ky.1946); *McClellan v. Kansas City*, 379 S.W.2d 500, 506 (Mo.1964); *Valley Bank v. State*, 115 N.H. 151, 335 A.2d 652, 654 (N.H. 1975); *Independent Electricians & Elec. Contractors Ass'n v. New Jersey Bd. of Examiners of Elec. Contractors*, 54 N.J. 466, 256 A.2d 33, 38 (1969); *Garono v. State Bd. of Landscape Architect Examiners*, 35 Ohio St.2d 44, 298 N.E.2d 565, 568 (1973); *see also Crazy Horse, Inc. v. Pearce*, 98 Idaho 762, 572 P.2d 865, 868 (1977); *State v. Canova*, 123 So.2d 672, 673 (Fla.1960), appeal dismissed, 365 U.S. 608, 81 S.Ct. 823, 5 L.Ed.2d 821 (1961); Annot., 4 A.L. R.2d 667 (1949); Annot., 136 A.L.R. 207 (1942). An extensive body of case law has developed protecting nonconforming uses that exist prior to the passage of zoning ordinances. *See* 6 P. Rowhan, Zoning and Land Use Controls §§ 41.01–41.04 (1978). Statutory provisions frequently protect water uses in existence at the time a state begins a permit allocation system for water rights. *See* 6 R. Clark, Waters and Water Rights § 502.4 (1972). Alaska's water use act contains such a provision in AS 46.15.060. Other Alaska statutes and rules recognize prior "uses" when imposing new conditions on a particular activity. *See* AS 02.05.040 (regulation of air carriers); AS 42.10.130 (regulation of motor carriers); Alaska Bar R. 2, § 3 (allowing admission from unaccredited law schools).

**50.** There may be instances involving people who had fished commercially under a gear

license a number of years previously, but had abandoned an interest in the fishery. Such individuals may suffer less hardship than some nonlicensees who have continued to be dependent on the industry for their livelihood. AS 16.43.260, which establishes standards for ranking applicants according to degree of hardship, and the regulations promulgated thereunder, may eliminate most applicants who have not maintained their dependence on the fishery. We do not believe, however, that such imperfections, to the extent that they are not eliminated, justify invalidating the classification system.

**51.** For example, there may be people too young to be eligible for a driver's license who are far more competent to drive an automobile than some who have reached the age of sixteen. (AS 28.15.031 provides that one must be sixteen years of age to obtain a motor vehicle driver's license.) In *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501–02 (1970), the Court stated:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. . . . [I]t does not offend the Constitution simply because [it] "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734.

In determining whether the gear license requirement bears a fair and substantial relationship to the purpose of preventing unjust discrimination in allocating entry permits, we also note that those who had gear licenses had to own or lease gear, and, as a result, often would be owners of vessels as well. The license requirement therefore is a rough way of designating a group having most to lose by being excluded from the fishery.[52] In this regard, the gear license requirement furthers the legislative purpose of preventing unjust discrimination because it seeks to protect those having the most to lose by exclusion from the fishery.

■ We conclude that the requirement that applicants for entry permits be past gear licensees does not violate the equal protection provision of the Alaska Constitution.[53]

Since the superior court did not have the opportunity to pass on Apokedak's contention that he was in fact a gear license holder by virtue of his alleged partnership or joint venture with gear licensee George Wilson in 1970 and 1971, the case will be remanded for a determination of that issue.

REVERSED AND REMANDED.

DIMOND, Senior Justice, with whom BURKE, Justice, joins, concurring.

I concur in the court's opinion that under the facts of this case the Limited Entry Act is not shown to violate the equal protection clause of the fourteenth amendment to the Federal Constitution, nor the provision in article I, section I of the Alaska Constitution which is dedicated to the principle (among others) that all persons are equal and entitled to equal rights, opportunities, and protection under the law. Nevertheless, I wish to point out that present operation of the Act does raise a serious constitutional issue.

In the Act's initial operation, I must agree that the circumstance of holding a gear license bore a fair and substantial relationship to a designated purpose of the Act—to avoid unjust discrimination in the issuance of entry permits.[1] But as the issuance of permits has progressed, and continues to progress, I believe I can detect a continuously developing classification of discrimination which, in my opinion, will result in injustice or unfairness, if this has not already occurred.

What I am referring to is the legislature's action in permitting entry permits to be transferred,[2] which has resulted in the permits being sold for very high prices. The statistics of the Commercial Fisheries Entry Commission show that in 1978 the highest prices paid for entry permits range from $30,000 to $60,000, depending upon the particular fishing area involved and the type of gear used.[3] This situation has the effect of creating another classification: on the one hand, the person with abundant financial resources; and on the other, a person of considerably more modest means. It seems to me that the Act is having the ultimate effect of favoring the well-to-do over the poor. In my opinion, this discrimi-

---

**52.** The Commission also points out that in determining economic dependence on the fishery, the amount of fish caught in the past can reliably be ascertained only by reference to the fish tickets signed by the gear license holder. We do not consider the means for accomplishing this administrative purpose to be of great weight, but it does constitute an added justification.

**53.** Our conclusion that the gear license requirement has been validly imposed makes it unnecessary to reach Apokedak's argument that gear license holding should not be a requirement for eligibility for certain income dependence points under the Commission's regulations. That issue would be reached only if Apokedak were found to be an eligible applicant. *See Commer-*

*cial Fisheries Entry Commission v. Templeton,* 598 P.2d 77, 81 (Alaska 1979).

**1.** AS 16.43.010(a) provides:

It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and *without unjust discrimination.* [Emphasis added.]

**2.** AS 16.43.170.

**3.** Alaska Commercial Fisheries Entry Commission, 1978 Annual Report, Appendix A, Table 3 (April 1979).

nation is basically unfair or unjust, and does not conform to the principle in article I, section I of our Constitution which requires equality of treatment of persons in the state.

I am also disturbed about another facet of the sale of entry permits. There were bound to be far more applicants than the number of permits that could be issued. In attempting to solve this problem, the basic thrust of the legislation was to rank applicants according to the degree of economic hardship they would suffer by exclusion from the fishery. Thus, those who could demonstrate a greater hardship would be favored in the issuance of permits.[4] This was certainly a legitimate way of solving the dilemma the state was in when it found that it was obliged to reduce the amount of gear used in the fishery, which in turn would require a reduction in the number of fishermen allowed to participate in the commercial fishery of the state.

For a growing number of permit holders, however, hardship is not a factor being considered. From a study and report made by Dr. Steve Langdon of the University of Alaska at Anchorage, dated October 15, 1979,[5] it appears that of the total number of entry permits issued, approximately 42 percent of these have been sold or transferred to other persons. All that the buyer of the permit has to do is "establish present ability to participate actively in the fishery." AS 16.43.170(b). There is no requirement that hardship be demonstrated. This results in another unjust classification: applicants for entry permits must demonstrate economic hardship in order to receive a permit; permit transferees need not make such a showing. I see no reason why transferees (close to one-half of the permit holders) should be favored over applicants in such a manner. The result is especially unfair because many persons in Alaska who could not afford the cost of a permit for sale might well be able to demonstrate a genuine hardship in being excluded from the fishery.

The means established by the legislature for distributing entry permits was certainly commendable when the Act first became operative. But with the passage of time, and the presence of AS 16.43.170 permitting the transfer of permits (for large sums of money), the original legislative purpose to regulate and control the entry into the commercial fishery of Alaska without unjust discrimination has become considerably weakened.

I concur in the court's opinion because the provisions regarding transfer of permits were not challenged in this case.

---

4. AS 16.43.250(a) provides:
 Following the establishment of the maximum number of units of gear for a particular fishery under § 240 of this chapter, the commission shall adopt regulations establishing qualifications for ranking applicants for entry permits according to the degree of hardship which they would suffer by exclusion from the fishery. The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the following hardship standards:
 (1) degree of economic dependence upon the fishery, including but not limited to percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, investment in vessels and gear;
 (2) extent of past participation in the fishery, including but not limited to the number of years participation in the fishery, and the consistency of participation during each year.

5. S. Langdon, Preliminary Report on Transfer Patterns of Alaskan Limited Entry Fisheries Permit Holders (October 15, 1979) (for the Limited Entry Study Committee of the Alaska State Legislature).