Artemie KALMAKOFF, Appellant,

v.

STATE of Alaska, COMMERCIAL
FISHERIES ENTRY
COMMISSION, Appellee.

No. 7767.

Supreme Court of Alaska.

Jan. 11, 1985.

**846**

Craig J. Tillery and Wilson A. Rice, Reese, Rice & Volland, P.C., Anchorage, for appellant.

Sarah Forbes, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

Nine years ago, Artemie Kalmakoff applied for a limited entry permit for the Chignik purse seine salmon fishery. The Commercial Fisheries Entry Commission denied his request and the superior court affirmed this denial. On appeal, he attacks the Commission's factual findings and parts of the point system that is used to determine who receives permits. We affirm in part, reverse in part, and remand for further proceedings.

After it received Kalmakoff's application, the Commission's staff eventually decided that he should be awarded seventeen points.[1] He had fished as a gear license holder from 1960 through 1966 (7 points), and fished as a crewman on other people's boats from 1967 through 1972 (6 points). Because he had been living in Ivanof Bay, an isolated village in a primarily rural census district, he received four points on the ground that alternative occupations to fishing were not readily available. Points for consistent participation as a gear license holder, investment in gear, and income dependence on the fishery were not awarded. Thus, Kalmakoff was classed at seventeen points, three short of the number needed for a permit.[2]

He challenged this classification and presented his claims at an administrative hearing on March 19, 1979. More than 20 months later, the hearing officer issued a recommended decision, rejecting Kalmakoff's claims for points for gear ownership and for income dependence. The gear ownership claim depended on Kalmakoff's alleged ownership of a usable purse seine, including a usable net, on January 1, 1973. *See* 20 AAC 05.630(b)(3)(C). The income dependence claim depended, at the administrative stage, on Kalmakoff's assertion that he had been a de facto gear license holder during 1972, and that this entitled him to income dependence points under the Commission's regulations and interpretive decisions. *See* 20 AAC 05.630(b)(1).[3] The

---

1. For a general description of the Limited Fisheries Entry Act, AS 16.43.010–.990, and the point system which governs permit applications, *see* Rose v. CFEC, 647 P.2d 154, 155–57 (Alaska 1982).

2. The Chignik purse seine salmon fishery is a "20-point" fishery. *See* 20 AAC 05.640 and 05.-320(6).

3. On appeal, Kalmakoff challenges the income dependence point regulations themselves. He could not do so at the administrative hearing because a hearing officer has no power to set

Commission adopted the hearing officer's recommended decision on November 19, 1981. The superior court affirmed that decision and rejected Kalmakoff's attack on the regulations. This appeal followed.

## I

Initially, Kalmakoff asserts that the Commission denied him a meaningful opportunity to be heard. We disagree. Formally, the Commission did all it should have done. It supplied Kalmakoff with copies of settlement sheets, which record transactions between fishermen and buyers. It wrote him thirty days before the scheduled hearing, informing him that he had a right to have an attorney or other representative present at the hearing, instructing him of other rights, and offering help in locating evidence. The Commission did not tell him that he could bring a translator if he needed one, but there is no indication in the record that it knew or should have known, before or even during the hearing, that Kalmakoff's command of English was inadequate. At the hearing, Kalmakoff was accompanied by members of his family and a personal representative. Although the hearing officer asked the Kalmakoff family "not to assist Mr. Kalmakoff in his answering," the hearing officer later allowed Mrs. Kalmakoff to translate a question, asked extensive questions of his own, and heard testimony from Joe Kalmakoff, Mr. Kalmakoff's son. Thus, our review of the record does not reveal a denial of due process.

 In itself, we see no constitutional violation in the Commission's failure af-firmatively to provide an attorney or an interpreter for Kalmakoff. No one requested such assistance. Kalmakoff was told that he had the right to have an attorney present. He did not exercise this right, choosing instead to have at the hearing a non-attorney as his personal representative.[4] Nor is it obvious to us that the lack of an interpreter denied Kalmakoff due process of law. When translation was necessary, Mrs. Kalmakoff did the translating. Further, review of the recording of the hearing leads us to agree with the Commission that Mr. Kalmakoff's faulty memory, rather than his lack of fluency in English, was primarily responsible for his testimony being incomplete and ambiguous.

 Limited Entry, unlike, for example, Social Security Disability Insurance, is not a benefit program for which hearing officers have an affirmative duty to develop the evidence. Due process considerations underlie a hearing officer's duty to ensure that a full and fair hearing takes place only if the benefit which a program provides is vitally important to those eligible for it.[5] A limited entry permit, while economically important to the person who applies for it, does not usually stand between that person and destitution. Assuming for purposes of argument that the hearing officer could have done more to assist Kalmakoff in remembering events which might have supported his point claims, we hold that this failure does not in and of itself constitute a denial of due process of law.

aside a challenged regulation. See 20 AAC 05.-815(b).

4. To the extent that Kalmakoff is asking us to hold that applicants have a constitutional right to be represented by Commission-appointed attorneys at administrative hearings, we reject his invitation. "While civil litigants have a constitutional right of access to the courts in limited situations, they have no general right to the assistance of counsel once access has been provided." Catz and Firak, The Right to Appointed Counsel in Quasi-Criminal Cases: Towards an Effective Assistance of Counsel Standard, 19 Harv.C.R.–C.L.L.Rev. 397, 407 n. 41 (1984). The

record shows that Kalmakoff was in occasional contact, before and after the hearing, with staff attorneys from the Alaska Legal Services Corporation.

5. Early federal cases holding that in social security disability matters hearing officers have an affirmative duty to develop evidence relied upon 20 CFR § 404.927 as support for their holdings. See, e.g., Coulter v. Weinberger, 527 F.2d 224, 229 (3d Cir.1975). This regulation no longer exists, but the duty remains. See, e.g., Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir. 1983). Due process concerns must therefore underlie the duty.

## II

Artemie Kalmakoff bought a purse seine in 1963 or 1964. If the seine was "used or to be used" in the Chignik fishery as of January 1, 1973, he should have received three gear ownership points under 20 AAC 05.630(b)(3)(C).[6] The hearing officer's findings and conclusions are as follows:

> Applicant's son testified that he used his father's purse seine in the Chignik purse seine fishery in 1969, that after that season the seine was stored, and then cut into pieces for use in the subsistence fishery sometime before 1972. Applicant testified that he used the old lead and cork lines and new webbing to construct a seine for the Chignik purse seine fishery in 1974. No bill of sale nor depreciation schedules were introduced [sic] evidencing seine ownership as of January 1, 1973.
>
> . . . .
>
> Applicant's claim of gear ownership under 20 AAC 05.630(b)(3)(C) must fail because of the testimony at hearing. As detailed in Case File 75–324 (currently under Commission consideration), 20 AAC 05.630(b)(3) requires that in order to receive gear ownership credit an applicant must have owned gear as of January 1, 1973, that was used or to be used in the fishery for which application is made and that "gear" in the salmon net fishery includes the net.
>
> The testimony at hearing established that the gear in question, a purse seine, was, "cut up for subsistence" before 1972 and that the old lines were reused in 1974. It must be concluded, therefore, that the net portion of the seine was cut up before 1972 since the lines were capable of being used on a full seine in 1974. Consequently, I recommend that no points be awarded for gear ownership because as of January 1, 1973, appli-

cant did not possess gear as defined by 20 AAC 05.630(b)(3)(C).

(Emphasis added).

■ In our view substantial evidence does not support crucial parts of these findings.[7] According to the transcript, Artemie Kalmakoff's own testimony was ambiguous:

Q. In 1972, was the web still good on the seine that you had?

A. Yes.

Q. Why did you decide to replace it in 1974?

A. It snagged (indisc.) buy a new one yet.

Q. When did it snag up and tear up, can you remember?

A. In '72.

Q. In '72?

A. I don't remember?

Q. You don't remember. Was it used in 1973?

A. I don't remember.

Q. Okay, you don't remember. . . .

The tape from which the transcript was made shows that Kalmakoff did not, in fact, say that the webbing snagged or tore up "in '72." What he actually said is unclear; the hearing officer may well have thought that he said "in '72," but the next question and answer should have established that he had said something else.

When Artemie Kalmakoff's son, Joe, testified, the interchange is easier to understand but not much more enlightening:

Q. And after you used the seine in '69, you say you stored it.

A. Um-hum.

Q. And then it was used after that in subsistence.

A. It was mostly subsistence.

(Gear must include the net in salmon net fisheries. In the troll fisheries, gear includes the lines, leaders and lures);

6. Under 20 AAC 05.630(b)(3), an applicant can receive points for "investment . . . in vessel, gear or set net site used or to be used in the fishery for which application is being made." The relevant part of this regulation reads:

 (C) Owns gear . . . . . . . . . . 3 points

7. When a CFEC decision depends on factual findings, a reviewing court applies a "substantial evidence" standard. *Jones v. CFEC*, 649 P.2d 247, 249 n. 4 (Alaska 1982).

Q. How? Was it cut apart....

A. Yeah, it was all cut up.

Q. The web was used?

A. Yes.

Q. Can you remember what years when it was used?

A. There's still little pieces laying around.

Q. What shape was the webbing in in 1972?

A. It was pretty well used up.

Q. The lines were there but the webbing had been cut off of it?

A. In '72?

Q. Um-hum.

A. Or what year?

Q. In '72.

A. Well it's still physically down there in just little chunks, you know, so— up in the (indisc.—simultaneous speech).

Q. That's the original web?

A. Yeah.

Q. What shape was it in in '72? The same shape as it is now?

A. It's pretty hard to say. It's used anyhow.

Q. But it had been used, say, before '72 for subsistence fishing?

A. Yeah, and it was used by my dad, I guess, in his fishing at Chignik, St. George.

In our view the evidence the hearing officer heard was far less definite than the conclusions he drew. His conclusions depend on his factual finding that the net had been "cut up for subsistence" before 1972. Joe Kalmakoff did not, however, testify that the net had been cut up before 1972. He said that the net had been cut up, but twice failed to say when this had occurred.

Nor did his father's testimony establish when this happened. And, the fact that the net had been used for subsistence fishing before 1972 does not in itself show that it had been cut up before 1972. It is possible to fish for one's subsistence with commercial gear. As far as the testimony itself is concerned, we conclude that there is no substantial evidence in the record that the net was not usable in 1973.[8]

■ On the other hand, the testimony does not show that the net was usable, and we think a holding that Kalmakoff had not carried his burden of proof on the issue would, on this record, have been difficult to challenge. The problem is that the hearing officer thought the testimony had established something which, in fact, it did not. His decision rests on his factual findings, not on burdens of proof. The superior court, reviewing the hearing officer's decision, held that the testimony was ambiguous, but that in any event Kalmakoff did not carry his burden of proof at the hearing. But the superior court's memorandum decision shows that it misinterpreted the hearing officer's reasoning: "Because of the conflicting testimony *about when the net was torn*, the hearing officer *found Kalmakoff did not meet his burden ....*" (emphasis furnished). This is not what the hearing officer found. His decision concentrates on the net having been cut up, and does not mention burden of proof in this context. We thus conclude, so far as gear ownership is concerned, that both the hearing officer's decision and the superior court's affirmance of that decision were erroneous.[9]

■ Not all errors, of course, require reversal. We have employed a "harmless error" standard in reviewing administrative determinations. *See North State Tele-*

---

8. "It must be concluded," the hearing officer observed, "that the net portion of the seine was cut up before 1972 since the lines were capable of being used on a full seine in 1974." At first glance this is, as Kalmakoff argues, a *non sequitur*. Perhaps the hearing officer just meant to indicate that the lines had not been cut up.

9. It is the Commission's decision, not the superior court's, which is our primary concern. When the issue before us is whether or not substantial evidence supports an agency's decision, we need not and do not defer to the superior court's conclusions on the issue. *See, e.g., Interior Paint Co. v. Rodgers,* 522 P.2d 164, 170 (Alaska 1974).

phone Co. v. Alaska Public Utility Commission, 522 P.2d 711, 715 (Alaska 1974). The relevant federal cases suggest that a court reviewing an agency decision should be much more reluctant to find "harmless error" than it would be if reviewing a lower court decision.[10] With this in mind, we are hesitant to affirm the Commission on a ground it did not consider. One important fact about the hearing supports our reluctance. The Kalmakoffs' testimony about gear ownership was in large part a response to the hearing officer's questions. It is apparent from the record that neither Mr. Kalmakoff nor his representative knew precisely what information would be relevant in getting points for gear ownership. The information before the hearing officer, then, depended almost entirely on the questions he asked. If the hearing officer made up his mind too quickly—and his factual findings suggest that he did—he would not have asked questions that might have created a more complete record. Because the hearing officer effectively decided what information would be produced, taking on himself the role that a better represented applicant's personal representative would have assumed, we will not affirm his decision on the ground that Kalmakoff failed to introduce enough evidence. For similar reasons, we think that a simple remand to the Commission for a determination of whether Kalmakoff met his burden of proof would be unwise. The appropriate disposition, given the ambiguities in the

evidence, is a remand to the CFEC for a new hearing.[11]

### III

Kalmakoff argues that he fished as a partner with a gear license holder in 1972, and that for this reason he should have received "special circumstances" points pursuant to State v. Templeton, 598 P.2d 77 (Alaska 1979).

Kalmakoff claimed that in 1972 he fished either with Frank Battishil (or "Bartishole"; it is not clear from the record how this name is spelled) or with Richard Culver on the boat "Mars." Apparently, he received 18.25% of the gross earnings. Testimony at the hearing did not establish what a crewman's normal share of the gross would have been during these years, or whether or not Kalmakoff's share was commensurate with what a partner would have received.

The hearing officer found:

It was never clearly established that in the years 1969 to 1972 applicant was [anything] but an experienced and knowledgeable crewman hired by licensed skippers who wanted to avail themselves of his experience and knowledge. Applicant's crew share reflected this and nothing more.

For this reason, the hearing officer concluded, Kalmakoff had not met his burden of establishing his qualifications for "gear

10. See Braniff Airways, Inc. v. C.A.B., 379 F.2d 453, 465–66 (D.C.Cir.1967) (Leventhal, J.) ("Of course, an error cannot be dismissed as 'harmless' without taking into account the limited ability of a court to assume as a judicial function, even for the purposes of affirmance, the distinctive discretion assigned to the agency."); Greater Boston Television Corp. v. F.C.C., 444 F.2d 841, 851 n. 16 (D.C.Cir.1970) (Leventhal, J.) ("The [harmless error] doctrine must be used gingerly, if at all, when basic procedural rights are at stake."); cf. People of the State of Illinois v. I.C.C., 722 F.2d 1341, 1348–49 (7th Cir.1983) (Posner, J.) (Although "we are not permitted to say, as we would be if we were reviewing a district court decision, that though we have doubts about the propriety of the stated ground for decision there is another ground that shows the decision was correct and we affirm on it," court was "sure that the agency would if we

remanded the case reinstate its decision," and "reversal would be futile," as court thought it "inconceivable" that if the agency had applied a different standard it would have come to a different conclusion.)

11. Other members of Kalmakoff's family might be able to shed some light on the factual problems this record presents.

Kalmakoff also argues that the hearing officer applied the wrong legal standard. In its briefing, the Commission says that a net was "used or to be used" on January 1, 1973, if with ordinary repairs it could have been made usable for the next fishing season. Kalmakoff claims that this standard is inconsistent with other Commission decisions involving similar facts. The decisions he cites do not support his claim.

license participation" points. *See* 20 AAC 05.520(a) and 05.820(d). Substantial evidence supports the hearing officer's factual finding, which we note was based on burdens of proof as well as factual conclusions. Kalmakoff contends, however, that the hearing officer applied the wrong legal test.

Kalmakoff is correct. The hearing officer's decision, written more than fifteen months after *Templeton* was decided and almost a year after the Commission decided not to enact regulations implementing *Templeton*, does not mention that case. Instead, the hearing officer referred to Commission decisions dealing with "constructive possession of a gear license," implying that *Templeton* points should only be awarded to people who: (1) were on board the vessel during fishing operations, while the actual holder of the gear license was absent; and (2) were under a belief that the gear license was being transferred to them. This standard does not purport to be a response to *Templeton*. Moreover, the State does not actually defend this standard in its briefing.[12] We therefore conclude that the hearing officer applied the wrong standard.

Nevertheless, the finding that Kalmakoff did not demonstrate that he was anything more than a crewman is supported by substantial evidence. If *Templeton* applies only to partners, not crewmen, then it is clear that Kalmakoff, who did not show that he was a partner, should not receive *Templeton* points. We thus affirm the CFEC on this issue, although the standard it used was inconsistent with *Templeton*.

## IV

We now turn to a more general problem. The parties agree that in 1971 and 1972 Kalmakoff derived income from fishing. They also agree that he did not personally hold a gear license in those years. Commission regulations reserve "income dependence" points for people who were gear license holders during the year being assessed, and for those who can show that "special circumstances" entitle them to income dependence points for the year in question. 20 AAC 05.630(b)(1) and (2). The Commission has determined that being a crewman is not a "special circumstance." *See, e.g., Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d 1255 (Alaska 1980) (*Apokedak I*). Kalmakoff challenges this regulation and ruling, which combine to deny him any points for income dependence, as conflicting with the Limited Fisheries Entry Act, unconstitutional, and inconsistent with our own decisions. For the reasons which follow, we reject his arguments.

### A. *The Statutory and Regulatory Scheme.*

The program prescribed by the Limited Fisheries Entry Act is complex, and the first part of our analysis depends on several specific provisions of the governing statutes. Before turning to those provisions, however, we think it appropriate to mention two important themes which run through these provisions and aid in their interpretation. First, the Act effectively transfers much of the legislature's rulemaking authority to the Commercial Fisheries Entry Commission. The statutes are general, but the regulations are necessarily specific; and it is clear that the legislature intended to give the Commission considerable discretion in promulgating them. *See* AS 16.43.100 and 110 (listing Commission powers). Second, the Act asks the Commission to reserve permits for people who had previously fished in a particular area and would suffer hardship if excluded from it. AS 16.43.250, 260(a).[13] "Grandfa-

---

**12.** The Commission's present five-factor test for the award of *Templeton* points is at issue in Chocknok v. CFEC, File No. S–222.

**13.** AS 16.43.260(a) provides:

*Application for initial issue of entry permits.* (a) The commission shall accept applications for entry permits only from applicants who have harvested fishery resources commercially while participating in the fishery as holders of gear licenses issued under AS 16.05.536–16.05.670 and interim-use permits under AS 16.43.210(a) before the qualification date established in (d) or (e) of this section.

ther rights" and "hardship" are both important considerations. The task before us, then, is to determine whether in the exercise of the discretion the legislature has given it, the Commission may define one type of hardship partially in terms of grandfather rights.

At issue is the Commission's regulatory interpretation of AS 16.43.250(a), which provides:

> Following the establishment of the maximum number of units of gear for a particular fishery under AS 16.43.240, the commission shall adopt regulations establishing qualifications for ranking applicants for entry permits according to the degree of hardship which they would suffer by exclusion from the fishery. *The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the following hardship standards:*
>
> *(1) degree of economic dependence upon the fishery, including but not limited to percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, investment in vessels and gear;*
>
> *(2) extent of past participation in the fishery, including but not limited to the number of years participation in the fishery, and the consistency of participation during each year.*

(Emphasis added). In the exercise of its discretion the Commission has established a point system for, among others, the Chignik purse seine salmon fishery, which awards points for "percentage of income derived from the fishery" as follows. If an applicant's "income dependence percentage"—"based on harvesting the fishery resource while participating in the fishery applied for as a gear license holder"—is 90% or more for 1972, the applicant receives six points. If the percentage is between 70% and 90%, the applicant receives three points; if less than 70%, no points. For 1971, an applicant who has derived 90% or more of his or her income for the fishery

receives four points; 70% to 90%, two points; less than 70%, no points. 20 AAC 05.630(b)(1) and (c)(2). For Kalmakoff, the problem is not that he did not derive income from the fishery in those years but that he was not then a gear license holder.

"[I]f special circumstances exist such that an applicant's income dependence is not realistically reflected by his income dependence percentage for the years 1971 and 1972," the regulations provide, "the commission may award an applicant up to a maximum of 10 points based on a special showing of income dependence." 20 AAC 05.630(b)(2). It is this regulation, we held in *Templeton*, which requires the Commission to award some income dependence points to people who but for the structure of their business partnerships during 1971 and 1972 would have held gear licenses during those years. "Special circumstances", we held, entitled those people to points. But we did not hold that being a crewman, as opposed to a gear license holder or a gear license holder's partner, is a "special circumstance," and the Commission has rejected this possible interpretation of its regulation. It argues that gear license holders and their partners, as a class, are dependent on fishing in ways that crewmen are not.

### B. *Are the Regulations Consistent With The Statute?*

■ Alaska Statute 16.43.250(a)(1) directs the Commission to consider an applicant's "percentage of income derived from the fishery." Kalmakoff argues that in doing this the Commission may not limit its consideration to the percentage of an applicant's income derived as a gear license holder. If "percentage of income" were the only inquiry the statute authorized the Commission to make, we would agree with Kalmakoff. For, just as much as a gear license holder, a crewman may have derived all or part of his income from fishing. But AS 16.43.250 also authorizes the Commission to

> (1) "adopt regulations establishing qualifications for ranking applicants ac-

cording to the degree of hardship they would suffer by exclusion from the fishery";

(2) "define priority classifications of similarly situated applicants";

(3) strike a "reasonable balance" among the statutory hardship standards; and

(4) evaluate applicants' "degree of economic dependence upon the fishery, *including but not limited to*" the four statutory economic dependence standards.[14]

We hold that these statutory grants of authority give the Commission the power to define one of the statutory economic dependence standards in terms of gear license ownership.

■ The question is a close one because the Commission is not free to disregard any of the standards the legislature has articulated. *Rutter v. State*, 668 P.2d 1343 (Alaska 1983). *Rutter* involved the Commission's determination that three of the standards set out in AS 16.43.250(a)(1) were irrelevant to the hardship fishermen would suffer by being excluded from the salmon hand troll fishery. The Commission attempted to evaluate economic dependence by assessing only one statutory factor, the availability of alternative occupations.[15] We held that it had exceeded its authority:

> That the Commission feels it could design a better classification scheme using only one of the factors is beside the point; it is not free to substitute its judgment for that of the legislature. Once the legislature determined that percentage of income derived from the fishery, reliance on alternative occupations and investment were relevant to econom-

ic dependence, the Commission was deprived of the power to decide otherwise. 668 P.2d at 1349. Kalmakoff contends that the Commission has effectively disregarded the "percentage of income" standard. We disagree. It has defined the standard, not disregarded it, and while other definitions would have been possible the Commission's definition is permissible.

■ Initially, we note that this part of our review of these regulations is relatively deferential. The legislature has directed the Commission to design hardship regulations. If, given this fact, a regulation is consistent with a statute's purposes and reasonably necessary to carry them out, we will not overturn it, provided it is reasonable and not arbitrary. *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

■ The statute's purpose, we believe, is that the Commission should determine which fishermen, among the group of former gear license holders eligible to apply, would have suffered the greatest hardship as of January 1, 1973, by being forbidden to operate gear. AS 16.43.260(d) provides that "an applicant shall be assigned to a priority classification based solely upon the applicant's qualifications as of January 1, 1973." Admittedly, hardship evaluated as of 1973 is not the same thing as present hardship, but this is a choice which Kalmakoff does not challenge and which the legislature has explicitly made. January 1, 1973, then, is the relevant date.[16]

■ The Commission has determined that persons who held gear licenses in 1971 and 1972 were more likely, other things being equal, to have been dependent on fishing and subject to hardship by being forbidden to fish in 1973 than those who did not hold gear licenses in 1971 and 1972. We recognized in *Apokedak I* that the

**14.** As we have said, the four statutory economic dependence standards are: "Percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, [and] investment in vessels and gear."

**15.** The Commission also considered "income from the fishery;" but "income from the fish-

ery," unlike "availability of alternate occupations," is not one of the statutory economic dependence standards.

**16.** AS 16.43.260(e) outlines an exception, not relevant here, for fisheries limited after January 1, 1975.

854

group of people who had held gear licenses at any time was, in a "rough way," the "group having most to lose by being excluded from the fishery." 606 P.2d at 1268. Members of this group, unlike, for example, crewmen, risked the loss of a status they had previously enjoyed. Moreover, people who were gear license holders in 1971 or 1972 were probably more likely to have operated gear in 1973 than people who were not gear license holders in those years. People who would have operated gear in 1973 would have suffered substantial hardship had they been forbidden to do so. The class of people the Commission's regulation favors is thus more focused on hardship than the class of former gear license holders we dealt with in *Apokedak I.* We therefore conclude that the regulations favoring 1971 and 1972 gear license holders are consistent with the statute's purpose.[17]

We also believe that these regulations were reasonably necessary to further this purpose. The Commission chose to define one of the four statutory hardship categories to favor 1971 or 1972 gear license holders, while also allowing people who could demonstrate "special circumstances" to receive points even though they had not held a gear license in 1971 or 1972. We think that it was reasonably necessary, in furtherance of the purpose of evaluating and avoiding hardship, to favor people who had held gear licenses in 1971 or 1972 over people who first held gear licenses after 1972[18] and people who last held gear licenses before 1971. People who had not

yet held gear licenses as of January 1973 were less likely to have committed themselves to the fishery as of that date, as we implicitly recognized in *Isakson v. Rickey*, 550 P.2d 359, 364–65 (Alaska 1976). People "who had fished commercially under a gear license a number of years previously, but had abandoned an interest in the fishery," we said in *Apokedak I*,[19] "may suffer less hardship" than others by being excluded from the fishery; these people, we now note, were unlikely to have held gear licenses in 1971 or 1972. The challenged regulations thus favor the people who had the most to lose if they had been forbidden to fish. We think the Commission correctly determined that the regulations were reasonably necessary.

Having said this, we have little trouble holding that the regulations in question are reasonable and not arbitrary. To the extent that they may be seen to draw rigid lines among people whose hardships seem indistinguishable, we note that the Commission's regulations provide for awards of income dependence points to people who can demonstrate that "special circumstances" exist. We held in *Templeton* that people who were not gear license holders in 1971 and 1972, but fished as partners with gear license holders during one or both of those years, were entitled to points under the "special circumstances" regulation. The regulation, as we have interpreted it, reduces the arbitrariness inherent in this as in all other regulatory schemes. The income dependence regulations are not arbitrary.[20] It remains to determine whether

---

**17.** The regulations at issue in *Rutter* may also have been consistent with Limited Entry's general purposes, as we have just defined them. The difference between *Rutter* and the case now before us is that in *Rutter* the Commission had disregarded explicit legislative language. Here, in contrast, it has defined and not disregarded the factors the legislature has specified. For some fishermen the Commission's decision not to award percentage-of-income points to people who did not hold gear licenses means that the percentage of income *they* derived from the fishery will not be considered. This fact makes this issue close. But the legislature left decisions on how to define income dependence up to the Commission, and this choice, unlike the

choice challenged in *Rutter,* is not inconsistent with AS 16.43.250(a)(1).

**18.** Some people who first held gear licenses after 1972 became eligible for permits under our decision in *Isakson v. Rickey,* 550 P.2d 359 (Alaska 1976).

**19.** 606 P.2d at 1267 n. 50.

**20.** Kalmakoff urges us to decide that crewmen, as a class, are entitled to "special circumstances" points. The problem is that crewmen, as a class, would have suffered less hardship by being forbidden to fish in 1973 than would the class of gear license holders. Substituting our

or not they constitute "unjust discrimination" or are unconstitutional.

## C. *Are the Regulations Unjustly Discriminatory or Unconstitutional?*

 The distinction to which Kalmakoff objects is a distinction between gear license holders, and people whom the Commission determines should be treated like gear license holders, and crewmen. The Commission has determined that as a group, 1971 and 1972 gear license holders had more to lose by being excluded from the fishery than did 1971 or 1972 crewmen. We will not repeat our discussion of the reasons why regulations based on this determination are consistent with the Limited Entry statutes, reasonably further their purposes, and are not arbitrary. The considerations we have already addressed persuade us that denying Kalmakoff income dependence points violates neither AS 16.-43.010(a) ("It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination") nor the Alaska Constitution's equal protection clause. Kalmakoff's challenge is not to Limited Entry in general [21] or to the Commission's refusal even to consider his application.[22] Rather, it is a challenge to the way the Commission has designed its point system. Accordingly, our review is deferential. *Rose v. Commercial Fisheries Entry Commission*, 647 P.2d 154, 161 (Alaska 1982). We think the regulatory preference for 1971 and 1972 gear license holders bears a fair and substantial relation to Limited Entry's purposes, *Isakson v. Rickey,*

550 P.2d 359 (Alaska 1976),[23] and does not constitute unjust discrimination.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

judgment for the Commission's on this issue, as we did in *Templeton,* we hold that the Commission was correct.

**21.** *See State v. Ostrosky,* 667 P.2d 1184 (Alaska 1983), *appeal dismissed,* —— U.S. ——, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984).

**22.** *See Wickersham v. State,* 680 P.2d 1135 (Alaska 1984).

**23.** Kalmakoff relies on passages in *Isakson* which suggest that the holding of a gear license has little if any relation to hardship. As we explained in *Apokedak I,* these passages have been superceded. 606 P.2d 1255 at 1261 & n. 20.