Estate of Lawrence LEWIS, Appellant,

v.

STATE OF ALASKA, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.

No. S–5532.

Supreme Court of Alaska.

March 31, 1995.

C. Michael Hough, Homer, for appellant.

T. Henry Wilson, Asst. Atty. Gen., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MOORE, Chief Justice.

## I. INTRODUCTION

The estate of Lawrence Lewis [1] ("Lewis") appeals the denial of his application for limited entry permits for the Cook Inlet and Prince William Sound herring sac roe purse seine fisheries by the Commercial Fisheries Entry Commission (the "CFEC"). After the CFEC denied his application, a CFEC hear-

---

1. Lewis died during the course of this appeal which his estate is now pursuing.

ing officer conducted an administrative hearing and affirmed the denial. The hearing officer found that Lewis had failed to establish that he was entitled to sufficient past participation and economic dependence points to qualify for either a Cook Inlet or Prince William Sound permit. In addition, the hearing officer ruled that Lewis was by statute ineligible to apply for a Prince William Sound permit because he had not legally harvested herring commercially in the specified years. Both the CFEC and the superior court affirmed all aspects of the hearing officer's decision. We affirm the hearing officer's ruling that Lewis was ineligible to apply for a Prince William Sound permit, but reverse his determination that Lewis had failed to establish sufficient points to qualify for a Cook Inlet permit.[2]

## II. FACTS AND PROCEEDINGS

### A. The Limited Entry Act

In 1973, the Alaska Legislature enacted the Limited Entry Act, AS 16.43.010 et seq. (the "Act"). The Act is a set of statutory provisions designed "to promote the conservation and sustained yield management of Alaska's fishery resources and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination." AS 16.43.010(a). To this end, the Act renders it illegal for anyone to operate gear in the commercial taking of fish after January 1, 1974, without either a valid limited entry permit or a valid interim-use permit. AS 16.43.140(a).

The legislature delegated implementation of the Act to the CFEC, AS 16.43.100, and directed the CFEC to identify which fisheries required controlled entry. AS 16.43.240. Once the CFEC limits entry into a fishery, it classifies the fishery as "distressed" or "nondistressed," AS 16.43.230, establishes the

maximum number of limited entry permits which may be issued, AS 16.43.240, and creates a regulatory system to rank permit applicants according to the degree of hardship they would suffer by exclusion from the fishery.[3] AS 16.43.250. There is no limitation on the number of interim-use permits which may be issued for a non-limited entry fishery. AS 16.43.200–.220.

### B. The Prince William Sound and Cook Inlet Herring Purse Seine Fisheries

In 1977, the CFEC designated the Prince William Sound and Cook Inlet herring purse seine fisheries as "non-distressed" limited entry fisheries, 20 AAC 05.310(a)(3)–(4), 05.320(b)(2) & (c)(1), and established a point ranking system specific to these fisheries, 20 AAC 05.662–.666. In enacting this point system, the CFEC recognized that "[d]ue to the unusual nature of the herring purse seine fisheries ... the award of any points to an applicant for consistency of participation could not be done with any degree of equity." Findings of the Commercial Fisheries Entry Commission Regarding the Priority Classification System Proposed for the Prince William Sound, Cook Inlet, and Southeastern Herring Purse Seine Fishery, dated February 17, 1977 (hereinafter referred to as February 1977 CFEC Findings). It noted that these fisheries are unusual because they "may or may not open to participation depending on the presence or absence of certain amounts of herring being simultaneously present and measurable by the Alaska Department of Fish and Game management personnel." Id. The CFEC further noted:

In these fisheries an opening may be measured in hours or minutes, and it is therefore not uncommon for an operator to be unable to set his net before the period closes. For these reasons consistency of participation does not truly reflect the his-

---

2. The CFEC's final action was its affirmance of the hearing officer's decision. It is this action which is currently on appeal. However, since the CFEC simply declined to modify or reverse the hearing officer's decision, we will examine the hearing officer's decision as the basis for the CFEC's denial of Lewis' application.

3. The CFEC has adopted point systems for this purpose which measure hardship by weighing two main factors: (1) the degree of an applicant's economic dependence on the fishery; and (2) the extent of the applicant's past participation in the fishery. AS 16.43.250; see, e.g., 20 AAC 05.600–.620.

torical participation of herring purse seine fishermen in these fisheries.

*Id.*

Because of the unusual nature of these fisheries, the regulations define "past participation" as either (1) the commercial taking of the herring resource in the designated fishery with a herring purse seine, interim-use permit and appropriate licenses, or (2) "being on the fishing grounds [in the designated areas], with the appropriate vessel, gear, licenses, and interim-use permit with the intention of taking the herring resource during the time season was open and the herring resource was harvested." 20 AAC 05.664(a)(3).[4] For Prince William Sound, the point system allows up to four points for past participation from 1974 through 1976, while the Cook Inlet system allows up to five points for those years. 20 AAC 05.664(a)(1).

With respect to the point system for economic dependence, the CFEC found that

> the income dependence standard does not lend itself as a valid measure of the economic dependence of a fisherman on these fisheries. Few, if any, fishermen actually depend on the herring sac roe fisheries as a reliable source of income. It is not any fisherman's primary fishery but rather a fishery of short duration prior to the salmon purse seine seasons in which he utilizes his salmon vessel and crew with only a special net required. The returns from these fisheries are usually of a "feast or famine" character because of the peculiar nature of the fishery....

*February 1977 CFEC Findings.* For both Prince William Sound and Cook Inlet, a maximum of four points may be awarded to an applicant for economic dependency on the fishery. 20 AAC 05.664(b). One point may

be awarded for ownership of a purse seine vessel as of the December 31, 1976 qualification date, two points may be awarded for ownership of a herring purse seine as of the qualification date, and one point may be awarded depending on the availability of alternative occupations in the location of the applicant's domicile as of the qualification date. *Id.*

Adding the available participation points and economic dependence points together, an applicant can receive a maximum of eight points for the Prince William Sound fishery and nine points for the Cook Inlet fishery. A total of six points is required to obtain a permit for either fishery. 20 AAC 05.666(1).

### C. *Lewis' Application*

Lewis filed an application for Prince William Sound and Cook Inlet herring purse seine entry permits in March 1977. For the Cook Inlet permit, Lewis claimed two points for participation in 1976, one point for participation in 1975,[5] one point for participation in 1974, one point for availability of alternative occupations, one point for investment in a vessel, and two points for investment in a herring purse seine net, for a total of eight points. For the Prince William Sound permit, Lewis claimed two points for participation in 1976, one point for participation in 1975, one point for participation in 1974, one point for availability of alternative occupations, one point for investment in a vessel, and two points for investment in a herring purse seine net, for a total of eight points.

In December 1977 the CFEC notified Lewis that it had verified four of the eight points claimed toward the Cook Inlet permit.[6] The CFEC also notified Lewis that he had been found ineligible to apply for the Prince William Sound permit under AS

---

4. *Cf.* 20 AAC 05.610 (points regulation for salmon and other limited entry fisheries established under 20 AAC 05.320). Under 20 AAC 05.610, an applicant must have actually "harvested" fish to qualify for "past participation" points.

5. It is not apparent from the record why Lewis claimed only one point for past participation in 1975 even though 20 AAC 05.664(a)(1) allows for two points.

6. The points verified were:

Past Participation in 1976        2 points

| | |
|---|---|
| Investment in Vessel | 1 point |
| Availability of Alternative Occupations | 1 point |
| | 4 points |

The points claimed but disallowed were:

| | |
|---|---|
| Past Participation in 1974 | 1 point |
| Past Participation in 1975 | 1 point |
| Investment in Herring Seine | 2 points |
| | 4 points |

16.43.260(a) because he had not "actively harvested the fishery resource commercially while participating as a gear license holder between January 1, 1960 and January 1, 1977." [7]

## D. *Administrative Review*

Lewis requested an administrative hearing to contest the CFEC's denial of his permit applications. He appeared without counsel for a first administrative hearing held in December 1978 in Seattle, Washington before hearing officer David Ingram. Lewis appeared with counsel for a supplemental hearing in October 1985 in Juneau, also before hearing officer Ingram. Following the receipt of additional documentary evidence, the record closed in April 1986.

After considering all of the evidence, the hearing officer issued a decision in October 1986. He found that Lewis had not met his burden of proving entitlement to any of the points that had not been verified, and he denied all of Lewis' appealed point claims. In doing so, he found that Lewis lacked credibility:

> Mr. Lewis has attempted to portray himself as being merely confused as to the facts of this case due to a heart attack; however, his credibility is found lacking due to his demeanor at hearing, inconsistencies in his testimony, his failure to produce corroborating evidence that he said he'd produce or was requested to furnish, and especially, his denials of illegal purse seining in 1975 in the face of overwhelming evidence to the contrary. As a result, his testimony is not to be believed, and the various affidavits and letters from others that attempt to corroborate that testimony are insufficient as they are suspect also and are of little weight since the demeanor of the affiants and others was not observed

and their assertions were not tested by cross-examination. The remaining documentary evidence is suspect or at least inconclusive as to the issues on which it was offered. Accordingly, there is no credible evidence of record to prove by a preponderance of the evidence that Mr. Lewis should be found eligible to apply or be awarded any of the points claimed.

The hearing officer also determined as a matter of law that Lewis was not eligible to apply for the Prince William Sound permit because Lewis had not harvested herring commercially as required under AS 16.43.260(a). He first ruled that Lewis' claimed 1975 commercial harvest would not render him eligible to apply for a Prince William Sound permit because Lewis had been fishing illegally without an interim-use permit in 1975. The hearing officer then rejected Lewis' claim that his participation in the fishery in 1974 and 1976 satisfied the statutory harvest requirement. The hearing officer also found that, even if Lewis had been eligible to apply, he had not proven entitlement to sufficient points to obtain a Prince William Sound permit.

After receiving the hearing officer's decision, Lewis filed what was deemed to be a petition for administrative review. That petition was denied by the CFEC, as was his subsequent petition for reconsideration. Lewis appealed the CFEC's decision to the superior court, which affirmed the CFEC's decision in all respects.

## III. *DISCUSSION*

### A. *Prince William Sound Permit*

■ When Lewis applied for a Prince William Sound permit in 1977, AS 16.43.260(a) provided: [8]

> **Application for Initial Issue of Entry Permits.** (a) The commission shall accept applications for entry permits only from applicants who have harvested fishery resources commercially while participating in the fishery as holders of gear licenses issued under AS 16.05.536–16.05.670 *and interim-use permits issued under AS 16.42.210(a) or 16.43.225* before the qualification date established in (d) or (e) of this subsection.

---

7. Because he had been found ineligible to apply for a Prince William Sound permit, the CFEC's decision did not address Lewis' claimed Prince William Sound points. These point claims were first addressed by the hearing officer at the next stage of the administrative process.

8. Throughout the history of this case, the parties have cited the 1981 version of AS 16.43.260(a) which provided:

**Application for Initial Issue of Entry Permits.** (a) The commission shall accept applications for entry permits only from applicants *who have harvested fishery resources commercially* while participating in the fishery as holders of gear licenses issued under AS 16.05.536–16.05.670 before the qualification date established in (d) or (e) of this subsection. The commission may specify by regulation the calendar years of participation that will be considered for eligibility purposes.

(Emphasis added.) Lewis challenges the hearing officer's eligibility ruling on two separate grounds: (1) he argues that the hearing officer misinterpreted the "harvest" requirement in AS 16.43.260(a); and (2) he asserts that the hearing officer's finding that he did not have an interim-use permit in 1975 was not supported by substantial evidence.[9]

1. *Interpretation of the "Harvest" Requirement*

■ The hearing officer construed the term "harvest" in light of other CFEC decisions involving the salmon fisheries, where harvesting of the resources is defined as "the bringing of the resource under physical control such that it could be commercially disposed of." *See Application of Andrew Gjerde,* CFEC 75–047 (December 10, 1975). The hearing officer thus reasoned that neither mere presence on the fishing grounds with the intent to catch herring, nor merely netting herring and then letting them go would constitute "harvesting," since the req-

uisite degree of physical control would be lacking.

Lewis argues that the unique nature of the herring fishery requires a different interpretation of the "harvest" requirement from that used in limiting the salmon fisheries. Lewis notes that, due to the uncertainty of actually catching and selling herring despite the necessary preparation and intent, "past participation" under 20 AAC 05.664(a)(3)(B) need not involve the actual commercial taking of the herring resource. He argues that, since an applicant could receive points for past participation even in the absence of an actual landing of herring, an actual landing should not be a prerequisite to applying for a permit. We disagree.

■ This court will not modify or extend a statute where the statute's language is clear and the legislative history reveals no ambiguity. *Alaska Pub. Employees Ass'n v. City of Fairbanks,* 753 P.2d 725, 727 (Alaska 1988). On its face, AS 16.43.260(a) requires an applicant to satisfy two independent conditions to be eligible to apply for an entry permit. The applicant (1) must have "harvested fishery resources commercially," and (2) must have done so while "participating in the fishery" with the appropriate gear licenses. An applicant who fails to satisfy either condition is not eligible to apply for a permit. AS 16.43.260(a). The legislative history indicates that the legislature intended these requirements to apply to all limited entry fisheries.[10]

9. On appeal, Lewis also asserts that the CFEC's ruling that he was ineligible to apply for a Prince William Sound permit violated his right to equal protection under the Alaska Constitution because he was treated differently than similarly situated applicants. He also contends that the CFEC is estopped from changing its interpretation of the statute; that the CFEC improperly applied a new rule of law retroactively; and that the CFEC has deprived him of the right to due process. As the state points out, Lewis did not raise these arguments below and we decline to consider them for the first time on appeal. *Sea Lion Corp. v. Air Logistics of Alaska,* 787 P.2d 109, 115–16 (Alaska 1990).

10. The Resources Committee initially introduced House Bill 126 to regulate the entry into Alaska Commercial Fisheries. That bill applied only to the salmon fishery. H.B. 126, 8th Leg., 1st Sess.

(Emphasis added.) Unlike the 1977 statute, the 1981 statute requires an eligible applicant to have harvested fish while holding a valid interim-use permit as well as a valid gear license. However, the parties' reliance on the 1981 statute does not impact the issues presented in this case.

The hearing officer ruled that AS 16.43.140(a) prohibited the commercial taking of fish without a valid interim-use permit after January 1, 1974, and that any illegal "harvest" taken in violation of AS 16.43.140(a) could not satisfy the "harvest" requirement in AS 16.43.260(a). Lewis has not challenged these rulings on appeal.

In any case, we are persuaded that the hearing officer correctly applied the applicable statutes. In *Simpler v. State,* 728 P.2d 227 (Alaska 1986), we observed that only individuals who had *lawfully* harvested fishery resources under AS 16.43.140(a) could apply for a permit under AS 16.43.260(a) (1977).

Although it may be true that the sac roe herring purse seine fishery is unique due to the uncertainty of catching and selling herring in a given season, Lewis' proposed interpretation of the statute effectively equates "harvested . . . commercially" with "participating in the fishery." Such a reading violates the common meaning of these terms [11] and renders superfluous the "harvested" eligibility condition in AS 16.43.260(a). "We recognize a presumption that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous." *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 530–31 (Alaska 1993) (citing *Alaska Transp. Comm'n v. AIRPAC, Inc.*, 685 P.2d 1248, 1253 (Alaska 1984)); *see also Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1045 (Alaska 1992) ("As a general rule, a 'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.' ") (quoting *Alascom, Inc. v. North Slope Borough, Bd. of Equalization*, 659 P.2d 1175, 1178 n. 5 (Alaska 1983) and 2A C. Sands, *Statutes & Statutory Construction* Sec. 46.06 (4th ed.1973)).

We also believe that the CFEC's interpretation of the "harvest" requirement—obtaining physical control for the purposes of commercial disposition—comports with the goals underlying the Limited Entry Act. The legislature developed the point system, in part, to assure that those who would suffer hardship by limited entry would not be excluded from the fishery. *See* AS 16.43.010; *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1261 (Alaska 1980) ("[O]ne of the primary purposes of the Act is to avoid unjust discrimination by ranking applicants for the limited number of permits 'according to the degree of hardship which they would suffer by exclusion from the fishery.' "). The CFEC's interpretation of the "harvest" requirement serves to rank applicants according to the hardship they would suffer by exclusion from the fishery. Although an applicant's failure to harvest fish successfully in any given year may not indicate a lack of economic dependence, *see February 1977 CFEC Findings*, an applicant's *consistent* failure to harvest fish successfully over a period of years does show a lack of dependence. In such circumstances, exclusion from the fishery would not cause economic hardship.

Finally we note that it is proper to defer to the agency's interpretation under these circumstances. The statutory scheme and the agency's delegated duties encompass the application of the permit system to a wide variety of fisheries. *See* AS 16.43.100 (providing that the CFEC shall designate particular species for which entry permits will be issued and establish qualifications for the issuance of entry permits). The agency was well aware of the difficulty of harvesting commercially in the herring purse seine fishery and nonetheless declined to interpret the eligibility statute by referring to the points regulation or by using it as a model. Under these circumstances, the interpretation of "harvested" and distinctions between "harvested" and "participating" in the herring purse seine fishery are matters of agency expertise to which we should apply the "reasonable basis" standard of review. *Rose v. Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982). It is especially appropriate here where the agency promulgated 20 AAC 05.644(a) to ameliorate the potentially harsh results which might flow from the difficulty of successfully harvesting fish in that fishery.

(1973); 1973 House Journal 504. Thereafter, a committee substitute bill was introduced which allowed the CFEC to designate the specific fishery resources to be subject to limited entry. C.S.H.B. 126, 8th Leg. 1st Sess. (1973); 1973 House Journal 504. This enabled the CFEC "to extend limited entry to other fisheries . . . without additional legislation." 1973 House Journal 504. That change remained in the final version of the bill. The Act, including the eligibility statute, applies to all fisheries to which the CFEC, within its discretion, limited entry.

11. As a general rule, words and phrases must be construed "according to their common and approved usage." *See* AS 01.10.040. Although "harvest" is not defined in AS 16.43.010 *et seq.*, its common meaning is "gather;" "reap" is a synonym. Webster's Third New International Dictionary (1966). "Gather" is in turn defined as "pick," "pluck," or "cull." *Id.* In the commercial fishing context, these terms necessarily imply the actual landing of fish. By contrast, "participate" merely means "to take part in an enterprise or activity." *Id.*

The agency chose to allow accumulation of points over a spread of years notwithstanding a lack of success in any given year. That scheme is consistent with a legislative eligibility scheme that requires successful participation, i.e. a commercial harvest, in at least one of the years for which points are sought.

### 2. Lewis' 1975 Harvest

■ Lewis contends that he made a number of landings in the Prince William Sound herring fishery in 1975. However, the hearing officer ruled that any "harvest" in 1975 would not render Lewis eligible to apply for a permit because Lewis had been illegally fishing without an interim-use permit in that year. On appeal, Lewis asserts that there is insufficient evidence supporting the hearing officer's finding that he did not hold an interim-use permit in 1975.

■ We review the CFEC's factual findings under the "substantial evidence" test. *Kalmakoff v. State, Commercial Fisheries Entry Comm'n,* 693 P.2d 844, 848 n. 7 (Alaska 1985); *Jager v. State,* 537 P.2d 1100, 1107 n. 23 (Alaska 1975); AS 44.62.570(c). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Commercial Fisheries Entry Comm'n v. Baxter,* 806 P.2d 1373, 1374 (Alaska 1991) (quotation omitted). In applying the substantial evidence test, we do not reweigh the evidence or choose between competing inferences, but only determine whether such evidence exists. *Interior Paint Co. v. Rodgers,* 522 P.2d 164, 170 (Alaska 1974). If the evidence is conflicting, we will view it in favor of the agency's findings even if we might have taken a different view of the facts. *Alaska State Comm'n for Human Rights v. Yellow Cab,* 611 P.2d 487, 490 (Alaska 1980).

Lewis offered conflicting testimony regarding the question of the 1975 interim-use permit card. First, at the 1978 hearing Lewis testified that he had all of his interim-use permit cards at home, and implied that he would produce the 1975 card. However, Lewis failed to produce the 1975 permit card, and then testified in the 1985 hearing that he does not keep the cards after the season is over.

Lewis was unable to produce any cancelled check, check register, or other documents demonstrating that he purchased an interim-use permit in 1975. Similarly, he was unable to produce any settlement sheets or other documents showing that a processor purchased an interim-use permit in 1975 on Lewis' behalf. The Commission records contained no record of Lewis having purchased the interim-use permit for the herring purse seine fisheries in 1975.

Lewis then testified at the 1985 hearing that he was "almost positive" that it was 1975 when he flew to Juneau to get the interim-use permit because he "sent it in and it was lost so [he] made a special trip." Lewis did not explain whether it was the application or the permit itself that was supposedly lost in the mail, nor did he explain how he came to understand that something was lost. Lewis did not offer any evidence such as airline tickets or expense records to verify the trip to Juneau. More importantly, he did not explain why, if he did make this special trip to Juneau, there was no record of an interim-use permit being issued.

Lewis also failed to explain why, in 1976, he submitted a pre-printed application to renew his interim-use permit for the statewide spawn-on-kelp fishery, but submitted a typed application for an interim-use permit for the statewide herring purse seine fishery. The pre-printed application forms for 1976 were automatically sent to individuals who held interim-use permits for 1975. Therefore, if Lewis had held an interim-use permit in 1975 for the herring purse seine fishery, he presumably would have submitted a pre-printed application, as he did for the herring spawn-on-kelp fishery, rather than a typed application. Nor did Lewis explain why three different purchasers of his herring failed to enter the permit number on the fish tickets which they gave him if Lewis really did have an interim-use permit and handed the correct card to the tendermen. After reviewing the various circumstantial evidence, we find that there was substantial evidence to support the hearing officer's finding that Lewis did not have the required interim-use permit when

he commercially harvested herring in Prince William Sound in 1975.

Therefore we conclude that the hearing officer properly ruled that Lewis was not eligible to apply for a Prince William Sound permit under AS 16.43.260(a).

### B. *Cook Inlet Permit*

The CFEC verified four of the eight points Lewis claimed in his Cook Inlet permit application. Lewis contends that the hearing officer erred in finding that he had failed to establish that he was entitled to the following additional points: (1) two points for his investment in a herring purse seine net; (2) one point for his participation in the fishery in 1974; and (3) two points for his participation in 1975.

▆▆▆ In limited entry proceedings, the applicant bears the burden of establishing qualification for all claimed points. 20 AAC 05.520(a). The hearing officer has no affirmative duty to develop the evidence. *Kalmakoff v. State, Commercial Fisheries Entry Comm'n*, 693 P.2d 844, 847 (Alaska 1985). A determination that an applicant has not established his qualification for points may be based on circumstantial evidence which tends to impeach the credibility of the applicant's testimony. *Baxter*, 806 P.2d at 1374–75. We review the CFEC's factual findings under the "substantial evidence" test. *Kalmakoff* at 848 n. 7; *see also Baxter* at 1374 (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

### 1. *Ownership of a Herring Purse Seine Net*

▆▆▆ Lewis claimed two points for ownership of a purse seine net in his Cook Inlet permit application. However, Lewis did not submit any documentation to support this claim. He later submitted an affidavit dated April 5, 1982, with an attached letter from Kenneth J. Quinn of Redden Net Company, stating that Lewis had purchased a herring purse seine from Redden in 1976. In the affidavit Lewis stated the purchase price was $6,000, that he accepted delivery of the net in March 1976, that he paid $3,000 to Quinn in

April of 1976, and that the balance was paid in 1977.

The hearing officer was skeptical of Lewis' claimed ownership of the net because of discrepancies between Lewis' testimony and the documents submitted. For example, the invoice from Redden Net Company shows that the net was sold to Kenneth Quinn, not Lawrence Lewis. When questioned about this discrepancy, Lewis testified that Quinn is a speculator who had purchased the net in his own name and resold it to Lewis for a profit. The invoice also shows a net price of $4,979.39 ($5,369.39 less a credit of $390), less than the $6,000 Lewis claimed to have paid for the net. The hearing officer asked for copies of the two cancelled checks by which Lewis paid the $6,000 purchase price. Lewis only produced a copy of one check dated June 2, 1976, for $3,000, made payable to Ken Quinn. However, he also produced copies of two more cancelled checks, for $130.00 each, with the notation "seine hanging" on them.

To qualify for the investment points, Lewis was required to prove ownership as of December 31, 1976. 20 AAC 05.664(b)(1)(B). The hearing officer asked Lewis when title to the net actually passed to him, and Lewis replied: "Well it'd be '77." Lewis' attorney immediately objected to the question on the grounds that it called for a legal conclusion. Lewis changed his answer and said that the net belonged to him in 1976. The hearing officer then asked if the net would have been depreciated on Lewis' income tax return for 1976. Lewis responded: "Oh, absolutely. I am sure it's on there." Lewis' attorney requested that the record remain open for at least 30 days so Lewis could produce copies of his 1976 and 1977 income tax returns to confirm whether the net was listed as a depreciable asset. Although the record remained open for over five months, Lewis never produced the tax returns.

The hearing officer held that, due to the inconsistencies between Lewis' testimony and the documentation submitted, as well as Lewis' failure to produce the tax returns, Lewis' claim should be denied. This conclusion of law lacks findings supported by substantial evidence. While Lewis was not able

to provide either the second check to Ken Quinn or his 1976 tax records, we hold that the information which he did provide was sufficient to prove that he owned the herring seine when he accepted delivery of the net in March 1976. *See* AS 45.02.401 (providing that, unless otherwise agreed, title to personal property passes to the buyer at the time and place at which the seller completes performance and delivers the goods). Therefore, we hold that Lewis was entitled to two additional points for ownership of a herring purse seine.

Because these additional points bring Lewis' Cook Inlet point total to six points, the minimum number required for a permit under 20 AAC 05.666, we hold that Lewis is entitled to a Cook Inlet limited entry permit.[12]

## IV. CONCLUSION

We hold that the CFEC properly ruled that Lewis was not eligible to apply for a herring purse seine permit in the Prince William Sound herring fishery under AS 16.43.260(a). We thus AFFIRM the CFEC's decision concerning the Prince William Sound permit. However, we REVERSE the CFEC's decision concerning the Cook Inlet permit. Lewis was entitled to two additional points for his investment in a herring purse seine net, bringing his total Cook Inlet point count to six, the minimum number of points required to obtain a permit. We therefore REMAND this issue to the superior court for REMAND to the CFEC with directions to issue a Cook Inlet herring purse seine permit to Lewis' estate.

AFFIRMED, in part, REVERSED, in part, and REMANDED.

---

12. Because our holding resolves this issue in Lewis' favor, we will not address the merits of Lewis' claim that he is entitled to additional participation points for the years 1974 and 1975.